CHARLES CARLSON v. CHARLES F. HAGLIN and Another.[1]

June 30, 1905.

Nos. 14,385—(126).

**Master and Servant—Safe Instrumentalities.**

Defendants, while reconstructing five elevator bins, employed one hundred thirty men for that purpose, and sought to accomplish the scheme by building inside concrete walls which were to be raised to a height of one hundred eight feet, three feet thereof being built at a time. This work required a scaffolding to be erected in accordance with plans furnished, to be put together by the men from material provided by the employer, which was to be lifted at intervals by means of tackle, pulleys, and ropes from above. This platform rested upon supports, and continued to remain the same structure but for the temporary lifting from time to time. Upon this platform a heavy box rested, containing concrete, and sustained a number of men who stood thereon, which tended to increase the strain upon it. When the platform had reached, through the progress of the work, a height of over seventy feet, in making a necessary change and lifting the same, one of the supports called "ledger boards" broke from defects therein, precipitating a number of the employees to the ground, who were instantly killed. *Held*, under the evidence, that the duty of the master in this case should have been necessarily controlled by the hazardous character of the work, which could not well be known or appreciated by the ordinary workmen engaged, and that the master's duty to furnish a reasonably safe place for his servants to perform their duties could not be avoided by allowing or authorizing any co-employees to select the material of which the scaffolding was to be constructed without making him a representative of the master, and hence that either by his appointment, or by inspection from time to time, or some other means to secure a reasonably safe place for the laborers to perform their work, the master was required to fulfil his obligation to his servants, and whether he did so in this case was a question of fact to be submitted to the jury.

Action in the district court for St. Louis county to recover from defendants, Charles F. Haglin and Peavey Duluth Terminal Company, $10,335 for personal injuries. The case was tried before Dibell, J., and a jury, which rendered a verdict in favor of plaintiff for $2,835.

[1] Reported in 104 N. W. 297.

Thereafter, on motion, judgment was ordered for defendants notwithstanding the verdict. From this judgment plaintiff appealed. Reversed and remanded, with leave to defendants to apply for a new trial.

*Jno. Jenswold, Jr.,* for appellant.

*Miller & Clapp* and *Washburn, Bailey & Mitchell,* for respondents.

LOVELY, J.

Plaintiff recovered a verdict for personal injuries. Defendants' motion for judgment notwithstanding the verdict was granted. From this judgment plaintiff appeals.

In disposing of the questions raised on this appeal, many of the details may be omitted under the view we have taken of the proper determination of the one controlling question, whether the liability of the master to provide a reasonably safe place for his servants to work was, under the circumstances, fulfilled.

It appears by the record that from the latter part of June, 1903, and for more than three months thereafter, defendants were engaged in constructing the inside walls of five circular elevator bins in the Peavey elevators at Duluth. These bins were covered; they were to extend one hundred eight feet above the surface to the top of the proposed work, and required a movable scaffold or platform of planks resting on joists, which platform was to be raised by means of a hoist and pulleys, three feet at a time, as the walls to that extent rose and occasion required in constructing the concrete walls. In this work one hundred thirty men were engaged, under a general superintendent. There were three gangs, viz.: A scaffold gang, who worked on the inside platforms; an outside gang, who attended to the work of preparing a concrete mixture of cement and cobblestone to be taken to the top of the existing structure, where, by use of a spout, it was to be dropped into a box located on the platforms below; also a construction gang, whose duty it was to lay the concrete in the walls (this gang was composed of workmen who stood on a platform, and consisted of some eight or nine men). To meet this condition the scaffolding was prepared at the beginning of the work, according to a plan adopted by the superintendent (Talbot), which is conceded to be, and was, necessary. According to this plan, which was carried out, the scaffolding was com-

posed of three parallel twelve-foot planks running around the inside of the bins, the square ends of the boards being beveled and lapping upon each other, each resting upon 2x12 joists which are termed "ledger boards." As the work progressed, upright joists were extended around the inside of the elevators next to the concrete walls in a circular series, with a space between for board supports. At a distance from these outside joists nine feet within was a series of joists parallel to the others, put up in the same way, and so placed that there was a similar space between them. In these spaces boards were also placed on which, as well as on the formerly mentioned joists, rested the ledger board foundations which sustained the weight of the platform. When a section of the concrete walls of three feet had been constructed, which required less than two days, the platform was lifted three feet higher. New boards were placed between the upright joists, to which the ledger boards were lifted and placed thereon. On this platform, as thus sustained, the platform gang stood and worked with the box for concrete, which weighed at the time of the injury over five hundred pounds, so that, under the plan provided and followed, the platform, while it contained ledger boards, planking, and the ordinary scaffolding material, was to continue until the necessary height of the work had been reached—one hundred eight feet. The material for the platform was furnished by the master, and from it selected in the first construction by the servants generally. These servants, many of whom were changed from time to time, were also changed in their places at work in the different gangs under different foremen, but the character of the work, so far as any specific service therein, remained the same. When the scaffolding had been raised and held up by the ropes and tackle, it was necessary to take each section of about twelve feet, raise it, then raise the corresponding section next to it, and thus continue in the same way around the entire circle until the platform had been established on the new level required.

From this general description it will be realized that the scheme was peculiar; that it required in the first instance its adoption; that, as the work progressed, the danger to the men from the fall of the platform, and almost certain death therefrom, became greater by reason of the distance in height from the ground of the platform on which the employees were required to stand in the performance of their duties.

There was no specified appointment of any other manager of the business to select material for platforms than the superintendent (Talbot), who furnished the plan, and under whom all the men were at work. The employees were ordinary workmen, with no special knowledge of the duties of constructing the platform or any exigencies arising in the progress of the work. They could not, and were not required to, foresee what extraordinary hazards would arise by reason of the repeated lifting of the scaffold in the way it was done, nor the necessity of the most careful selection of material for the foundation ledger boards, nor of inspecting the same as the work went on. The work as described continued until the scaffolding had been lifted for about three months to a height between seventy and eighty feet, when, in lifting the scaffold in the usual way, as was necessary, one of the sections was raised, and pulling it up by tackle in moving the concrete box resting thereon, while workmen were engaged in pushing and pulling it, the strain became much greater than usual, when a defective ledger board broke, the platform fell, several workmen were precipitated to the ground, five of whom were instantly killed, the plaintiff was seriously injured, for which he recovered a verdict, which the trial court in the exercise of its judgment set aside, directing judgment for defendants.

It will appear from the somewhat general description which we have given of the work that it was very complicated, involved extraordinary hazards, which must have been within the contemplation of the master at the beginning, and would not be reasonably supposed to be understood by the ordinary workmen engaged either on the scaffold or in laying the concrete on the walls. The plaintiff in this case was a common laborer, who had been employed about two weeks before the injury. His service was similar to that of all his fellow laborers, who might any of them be discharged at the instance of the superintendent, and were none of them required to understand either the plan adopted, or the dangers or hazards which the progress of the work necessarily involved by reason of the daily increasing height of the scaffold, or its very uncertain stability, or the weight that must be continually placed upon it, or the system by which the changes were made, with the incidental increasing pressure upon the boards of the scaffold. The learned trial court, in ordering judgment, was led to the conclusion that the

plaintiff was a fellow servant with his colaborers in the construction of the scaffold and elevators, under the rule, which has been so·many times laid down in this country and recognized in this state, that, where proper material is furnished, and employees of intelligence authorized to select and use it, each one so associated is a fellow servant of the remainder, and that the master is not liable for any negligence whereby one so associated is injured.

The leading case of Gittens v. William Porten Co., 90 Minn. 512, 97 N. W. 378, reviews the decisions on this subject. We held in that case, where material had been furnished by a master for a structure to be made by other servants, the conditions of which were open and plain to the understanding of a party injured, that under the facts he was a fellow servant with the others, and could not, by reason thereof, recover for injuries from risks which he had assumed. Counsel for defendant relies on this case to support the order appealed from, but we are unable to concur in this view, which led to the conclusion reached by the learned trial court, for the principle of that case is clearly distinguishable from this. In that case the temporary scaffold was simple in design and its risks easily appreciated, and we think there is no mystery regarding the principle which governs any of the decided cases in this forum. It is unquestionably the duty of the master to furnish a reasonably safe place for his servants to work. This is presumed, and should not be avoided; hence, if it is delegated, the master is responsible for the acts of his representatives, and, where the master furnishes material to construct the place and the risks are apparent and within ordinary comprehension or intelligent understanding of his servants, under such circumstances they necessarily assume the risks of the service; but where, as in this case, a plan is required for its development, or to provide against dangers during progress which can only be within the contemplation of the master, it is unreasonable to say that common ordinary laborers who have nothing to do with furnishing the plan or directing the work must foresee or understand either the necessity of selecting proper material, or inspecting it from time to time. Where serious but obscure dangers are involved, as here, it would be a palpable violation of all principles upon which the rule requiring the master to furnish a proper place for the servant to

work rests to hold that the servants under such circumstances assumed risks which belonged to the master as a personal and absolute duty.

As we have stated in the case of Borgerson v. Cook Stone Co., 91 Minn. 91, 97 N. W. 734, it is often a question of fact whether a vice principal is required to perform the master's duties or not; but where the facts are clear, and the duty to furnish the proper place for the servant to work is plain, the duty of the master must be performed at his peril. He cannot absolve himself from it by leaving to any other servant the obligation of performing this duty for him. It seems very clear that the character of the structure in this case was such, and the dangers involved of that nature, that the duty to furnish the material could not be delegated absolutely to ordinary common laborers who were to use the same; and it is no excuse to say that, because some of the servants selected the materials which were to be used by others who might be changed from time to time, involving risks which none of such servants could anticipate, each and all of such fellow workmen were fellow servants of the other, and hence that all were absolved from any effort by the master to perform that which appears to us very clearly to have been a personal duty of his, the failure to comply with which precipitated in an instant several men to their untimely death. While the recent case of Hagerty v. Evans, 87 Minn. 435, 92 N. W. 399, is not in all respects like this, it is similar in the application of the principle upon which the result here depends. Our conclusion is also in accord with the views expressed in Borgerson v. Cook Stone Co.

It is held that the learned trial court erred in directing a verdict for the defendants. The judgment must be reversed, and the cause remanded with leave to defendants to apply for a new trial if they be so advised.